133 Ga. App. 488 (1974)
211 S.E.2d 430
INTERNATIONAL HARVESTER CREDIT CORPORATION
v.
ASSOCIATES FINANCIAL SERVICES COMPANY, INC. et al.
49816.
Court of Appeals of Georgia.
Argued October 3, 1974.
Decided December 5, 1974.
Hansell, Post, Brandon & Dorsey, W. Rhett Tanner, for appellant.
Kilpatrick, Cody, Rogers, McClatchey & Regenstein, George B. Haley, Jr., Robert W. Coleman, for appellees.
WEBB, Judge.
Associates Financial Services Company, Inc. ("Associates") commenced two actions seeking to foreclose on security interests it held in two 1970 International tractor-trucks. International Harvester Credit Corporation ("IHCC") joined issue by filing its claim affidavit, claim bond, and forthcoming bond in each action, and subsequently disposed of the two trucks by sale. The two actions were consolidated by agreement of the parties; both parties moved for summary judgment; the trial court granted IHCC's motion and denied that of Associates; and this court reversed in a prior appeal, holding that neither party had carried its summary judgment burden. Associates Financial Services Co. v. International Harvester Credit Corp., 127 Ga. App. 636 (194 SE2d 518).
Following additional discovery, the case came on for trial before the court without a jury. The evidence disclosed that Sebring International, Inc. ("Sebring") was a duly authorized dealer for International Harvester Company ("IH") with its principal place of business in Scottsboro, Alabama. Pursuant to a "Dealer Sales and Service Agreement," effective April 1, 1969, Sebring was authorized to maintain an inventory of International motor trucks and to sell the trucks from inventory in the ordinary course of retail trade, even though they may have been financed through a "floor plan" arrangement with IH or IHCC as provided for in the agreement. In July, 1969, a UCC-1 form financing statement was filed by IHCC in Alabama, showing IHCC as the secured party and Sebring as the debtor, and describing the collateral as "all new or used motor trucks and trailers of whatsoever description; ... and all other items of tangible personal property held or offered for sale by the debtor." Proceeds from the collateral were also covered.
On September 29, 1969, Sebring ordered the two new International tractor-trucks in question from IH. The order, which was approved by IH, and the "wholesale *489 orders," prepared by IH, showed that the trucks were being ordered specially equipped for Campbell Truck Leasing, Inc. ("Campbell") as the customer, and that the sale to it by Sebring was to be financed by an outside source. In November, 1969, the trucks were delivered to Sebring by IH, and Sebring "floor planned" the purchase of the trucks by executing to IH a note and security agreement as contemplated by the dealer agreement. This document was in turn assigned to IHCC.
Sometime prior to January 12, 1970, Sebring communicated with Associates, which was engaged in the business of purchasing commercial paper, chattel paper, conditional sales contracts, etc., to determine whether Associates was interested in financing Campbell's purchase of the two trucks from Sebring. Associates conducted an investigation of Campbell's credit standing and determined that Campbell was acceptable as a purchaser of the trucks. Prior to this occasion Associates had financed the purchase of other trucks by Campbell, and the sale of other trucks by Sebring.
On January 12, Campbell executed two "Alabama Security Agreements" and notes for the purchase of the trucks on security agreement forms supplied by Associates. Each agreement recited a cash down payment of $4,350 by Campbell, and in a printed portion of each form Campbell acknowledged delivery and possession of each truck. Campbell agreed in each note to pay the holder $21,054 in 35 consecutive monthly instalments of $584.83, and a final instalment of $584.95. These agreements were assigned to Associates by Sebring on the same day they were executed.
As a condition of financing the sale, Associates required Campbell to execute as additional collateral an "Assignment of Lease Monies," which assigned to Associates the right to receive all monies due Campbell from truck leases with a concern known as Imperial Carpet Mills, Inc. On January 14, Sebring delivered the agreements and assignments to Associates' office in Tennessee. At that time, Associates verified the two agreements by calling Campbell's office and paid Sebring $34,800 for the two agreements. Sebring, however, failed to pay this amount over to IHCC. On January 26, *490 Associates perfected its security interest in the trucks by filing Form UCC-1 financing statements in Alabama showing Campbell as the debtor, Sebring as the secured party, and Associates as assignee of the secured party. Sebring paid the Alabama sales tax as required on each truck, and Campbell insured them as provided for by the agreements.
The factual circumstance giving rise to this dispute is that contrary to the recitations in the "Alabama Security Agreements" assigned to Associates, Campbell did not make the cash down payments nor was actual possession of the trucks taken by him. He had ordered trailers to be used in conjunction with the tractor-trucks; he had no place to store the trucks until the trailers were ready; and he and Sebring agreed that the trucks were to be left on Sebring's lot until the trailers arrived, at which time Campbell would make the cash down payment and take possession. In the interim the amount of the down payments had been charged by Sebring to Campbell on open account, and the testimony was that Campbell and Sebring had always done business in this manner.
Because events transpired in such a manner that Campbell never made the cash down payment and never took actual possession, IHCC contends that the transaction was never finalized and that there was no "sale" of the trucks by Sebring to Campbell. However, throughout the course of these events IH and IHCC treated the trucks as being sold. From the time the trucks were ordered, IH had knowledge that Campbell was buying them and that he was financing the purchase through "outside financing." After the trucks were delivered to Sebring's lot, IHCC conducted monthly inventories of Sebring's sales and trucks on hand and always listed the trucks as being "Sold  Not Billed Out," showing Campbell as the purchaser, and indicating that the two trucks were to be delivered to Campbell along with a third truck at some time in the future. The report for January 15 specified that the trucks were to be delivered to Campbell "in about 65 days." In March, IHCC found out that Associates had, back in January, paid Sebring for the agreements and had filed financing statements, and IHCC then went to Sebring's lot, *491 inventoried the trucks, and listed the trucks in question on the proceeds inventory form rather than the truck inventory form. A notation was made on the form that the trucks were "On lot but sold." Demand was made upon Sebring to pay over the $34,800.00 received from Associates, but, unfortunately, the check "bounced," Sebring was unable to continue in business, and the dealership was terminated.
Subsequently, IHCC took possession of the trucks and dealt with Campbell as the buyer, telling him the trucks were being stored for him on another dealer's lot in Guntersville and would be available for him on April 15. Campbell attempted to make the cash down payment and take possession of the trucks in accordance with his collateral agreement with Sebring, but IHCC moved the trucks to Atlanta prior to April 15 and refused to turn the trucks over because it had not been paid by Sebring on its floor-plan note. IHCC never gave Sebring any credit on its indebtedness for the return of the trucks and was still demanding payment of the floor-plan note on the two trucks at the time this action was commenced by Associates.
The trial court made findings of fact substantially as outlined above, and concluded that there was a sale of the trucks to Campbell on January 12 which was accomplished by the execution of the two "Alabama Security Agreements" and notes; that each of them was complete on its face and constituted valid chattel paper; that there was a valid transfer of the chattel paper by Sebring to Associates for new value, and that Associates took possession of it in the ordinary course of its business; that Campbell breached the agreements by failure to pay the instalments, and as a result Associates was entitled to repossess the trucks; that on August 21, 1970, the trucks were repossessed by Associates as the secured party pursuant to the assigned agreements; that Campbell was a buyer in the ordinary course of business when it purchased the two trucks, and as a result took the trucks free of any security interest in the trucks created by Sebring; that Associates was an unpaid transferee of chattel paper resulting from the sale of goods; that Associates had a valid perfected security interest in the *492 trucks which was entitled to priority over any security interest held by IHCC; and that since IHCC had filed a forthcoming bond and disposed of the trucks, Associates was entitled to a money judgment against IHCC for their value, not to exceed the amount owed to Associates by Campbell. Held:
1. No question has been presented as to the manner or validity of the perfection of any of the security interests; and the parties stipulate that since the relevant provisions of the Uniform Commercial Code are identical in Alabama and Georgia, the Georgia statutes may be cited for convenience.
There is no dispute that if Campbell was a "buyer in ordinary course of business" (Code Ann. § 109A-1  201 (9)), or if Sebring's "action" was authorized by IHCC, then the latter's security interest in the goods collateral would have been lost by virtue of Code Ann. § 109A-9-307 (1) in the first instance, and by virtue of Code Ann. § 109A-9-306 (2) in the second. In either event IHCC's security interest would have shifted by virtue of § 109A-9-306 (2) from the goods collateral to the proceeds, i.e., the chattel paper consisting of the "Alabama Security Agreements" and notes. Code Ann. § 109A-9-306 (1). However, Associates would be entitled to priority over IHCC as to the chattel paper (Code Ann. § 109A-9-308), and hence entitled to priority as to the returned or repossessed trucks. Code Ann. § 109A-9-306 (5b).[1]
IHCC attempts to throw a monkey wrench into this Commercial Code machinery by insisting that there was no "sale" of the trucks by Sebring to Campbell, and hence that Associates had no security interest at all. The sole thread upon which IHCC hangs itself is the "no sale" contention, and it cites § 109A-2-106, defining "sale" as "the passing of title from the seller to the buyer for a price (109A-2-401)." And, in support of the assertion that title *493 did not pass from Sebring to Campbell, reliance is placed upon § 109A-2-401 (2), which provides: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but (b) if the contract requires delivery at destination, title passes on tender there."
However, § 109A-2  401 (3) provides: "Unless otherwise explicitly agreed where delivery is to be made without moving goods, ... (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting." (Emphasis supplied.) Comment 4 to the Uniform Commercial Code, 1962 Official Text, points up the distinction between subsection (2), applicable to "shipment" contracts, and subsection (3), applicable here: "The factual situations in subsections (2) and (3) upon which passage of title turns actually base the test upon the time when the seller has finally committed himself in regard to specific goods. Thus in a `shipment' contract he commits himself by the act of making the shipment. If shipment is not contemplated subsection (3) turns on the seller's final commitment, i.e., the delivery of documents or the making of the contract."
In the instant case, since the two trucks were delivered to Sebring in November, 1969, pursuant to the retail and wholesale orders previously placed for the trucks, the trucks were "identified to the contract" when the contracts were executed on January 12, 1970 (Code Ann. § 109A-2-501 (1a)), and title could pass at that time. Code Ann. § 109A-2-401 (1). No documents of title (Code Ann. § 109A-1-201 (15)) were to be delivered, and Campbell was to take delivery of the trucks at Sebring's lot. Hence, unless Sebring and Campbell "otherwise explicitly agreed," title passed at the time and place of *494 contracting. Code Ann. § 109A-2-401 (3b). The lower court, as the trior of fact, was amply authorized to find that the intention of the parties was to delay servicing and delivery of the otherwise "sold" trucks until a later date, and the finding of the trial court that there was a "sale" of the trucks on January 12, which was accomplished by the execution of the two agreements and notes, will not be disturbed. Kingston Development Co. v. Kenerly, 132 Ga. App. 346, 348 (1) (208 SE2d 118).
With the "no sale" thread cut, IHCC must fall. Moreover, on facts strikingly similar to these here, the same result has been reached in a contest between a "wholesale" and a "retail" financer, but without resort to the technical niceties of definitions in the Sales article of the U.C.C. in Chrysler Credit Corp. v. Sharp, 56 Misc. 2d 261 (288 NYS2d 525), Mrs. Sharp, seeking to purchase an automobile from a car dealer, signed a printed form captioned "car order" which was received by the dealer subject to acceptance after a credit investigation by Chrysler Credit Corporation, who was the proposed retail financer of the purchase. Chrysler Credit approved the proposed purchase, and thereafter a printed instrument entitled "Retail Instalment Contract" was signed by Mrs. Sharp and by the dealer. The contract was then assigned by the dealer to Chrysler Credit for value, which perfected its security interest by filing.
The instalment contract contained, in a printed portion, an acknowledgment of delivery and acceptance of the car by the buyer. Under the assignment portion of the contract, the dealer warranted that the buyer had paid the down payment as stated in the contract. By its terms the contract provided for a trade-in, which was actually delivered to the dealer, and further provided for a cash down payment of $443. Despite the recitations in the contract, however, the cash down payment was not in fact made, the car was not in fact delivered to Mrs. Sharp and the automobile title papers were not delivered to her. As the court stated, "The arrangement between the sales manager and of Mrs. Sharp was that she, as retail purchaser, was to make the cash payment when she received an income tax refund which she expected to receive in the immediate future and that the car was to be *495 left on the lot until the cash payment was made." Before this occurred, however, the dealer's inventory financer, a bank, seized all of the dealer's autos on its lot and sold the one in question. Chrysler Credit then brought this action against Mrs. Sharp on the contract, and against the bank for conversion of the automobile.
Mrs. Sharp was never served, and the contest was one of priority between Chrysler Credit and the bank, which had a perfected security interest in the dealer's inventory. As the court stated: "The dispute, arising out of the attempt to enforce the secured credit agreement or retail instalment contract comes from the contention of the defendant bank that the entire transaction with Mrs. Sharp was executory only, that it was never consummated, title did not pass and it was null and void. The plaintiff, as a retail financer, on the other hand, contends that Mrs. Sharp was a buyer out of inventory in the ordinary course of business on her partly performed contract. Applying the (UCC) definitions[2] to the evidence, it may be said that Mrs. Sharp entered into a specific written contract to purchase the car owned by the dealer. She gave valuable consideration in goods, she traded in her old vehicle, and she signed a binding instalment contract. She agreed to pay in cash a down payment and a deferred payment. By agreement, orally, she specified the course of her down payment, an anticipated income tax refund, and she certainly, in good faith, expected to receive the car and to make her payments upon the evidence, UCC 1-102 (3). According to the testimony, she attempted to pay her cash deficiency a few days after the repossession by the bank, but, finding the car gone, abandoned her rights. The sales manager testified without contradiction, that they frequently took and negotiated contracts with the car to be held for a time for the cash down payment, that it was common practice in his twenty years experience in the car business to take contracts without actual receipt of the recited cash down *496 payment. He said he would fire a salesman who failed to do so and that in his experience and opinion a number of dealers would go out of business if they failed to follow this practice."
The court held that "the plaintiff finance company, having furnished new value which has been paid to the dealer on the assignment, and having purchased the chattel paper in due course, is entitled to the returned or repossessed goods under UCC 9-306 (5) (b), (c) and (d) and UCC 9-308, provided, as in this case, its interest has been perfected. [Cits.] In making this determination, the court has, of course, by inference, determined that the buyer of goods was a buyer in the ordinary course of business out of inventory. A discussion of this has been left to the close of this memorandum by reason of the fact that the entire relation of the parties as indicated above relates to whether the irregularities of the transactions would make Mrs. Sharp other than such a buyer... If there is a usage of trade which exposes an entruster on floor plan to certain risks, these are risks against which he can guard by audits and accounting procedures or he can refuse to knowingly expose himself to the risk with the particular dealer. To fail to place the exposure of such risk with the entruster in such situation would make it impossible for retail finance companies to do business with any dealer unless the entruster were directly a participant ... The court feels a buyer who makes a purchase on a printed form contract in good faith with a full understanding it is a binding contract, who knowingly signs a retail instalment payment obligation and trades in an old car in addition must, certainly as to a retail financer furnishing new value on the strength of such contract and as to an entruster giving the dealer wide latitude of sale goods, be deemed a buyer in the ordinary course of business, without regard to the technicalities of when title is to pass pursuant to collateral oral agreements or as to time of delivery and without the necessity of determining whether such delay brings about technically, a bailment, a non-delivery, a repossession or whatever."
The court accordingly gave judgment against the bank to Chrysler Credit, the retail financer, for the value of the car plus interest from the date of the bank's seizing *497 of the automobile. Professor Skilton, commenting upon this case and Universal C. I. T. Credit Corp. v. Middlesboro Motor Sales, 424 SW2d 409 (Ky. App.), which held for the retail financer on the basis that the dealer's action was authorized by the wholesale financer (UCC § 9-306 (2)), urges that the same result should obtain even without reference to the question of whether the purchaser was a buyer in the ordinary course of business, or whether the dealer's disposition of the collateral was authorized. 1974 Wis. L. Rev. 1, 76-88.
Under any view which might be taken of the instant case, IHCC is not entitled to priority, and the trial court did not err in rendering judgment for Associates.
2. Remaining enumerations, relating to alleged trial errors, fail to show harmful, reversible error.
Judgment affirmed. Pannell, P. J., concurs. Evans, J., concurs in the judgment only.
NOTES
[1] This section, rather than § 109A-9  312 (4), should have been utilized in upholding the retail financer's priority in International Harvester Credit Corp. v. Commercial Credit Equip. Corp., 125 Ga. App. 477 (188 SE2d 110), noted at 24 Mer. L. Rev. 41, 65.
[2] "Buyer in ordinary course of business," "agreement," "contract," "purchase," "purchaser," "sale," "passing of title," "usage of trade," etc.