HOME SAVINGS ASSOCIATION, APPELLANT, v. GENERAL ELECTRIC CREDIT CORPORATION, RESPONDENT.

No. 14333

October 22, 1985 708 P.2d 280

*Robison, Lyle, Belaustegui & Robb,* Reno, for Appellant.

*Hawkins, Rhodes & Sharp,* Reno, for Respondent.

## OPINION

*Per Curiam:*

This case involves the resolution of a priority interest dispute in the proceeds of the sale of twenty-one mobile home units. Respondent General Electric Credit Corporation (GECC) had seized the units as part of the inventory of Northern Nevada Mobile Home Brokers, Inc. (Northern Nevada) upon its discovery of Northern Nevada's breach of its inventory financing agreement with GECC. In a declaratory relief action brought against appellant Home Savings Association (HSA), both GECC and HSA claimed priority in the units by virtue of their perfected security interests. The district court held that GECC had priority and awarded GECC the proceeds of the sale. This appeal ensued.

### THE FACTS

Northern Nevada sold new and used mobile home units. GECC financed inventory purchases of Northern Nevada pursuant to several 1976 security agreements which granted GECC a security interest in "all inventory, new and used, presently owned and hereafter acquired, together with all proceeds of the sale or other disposition thereof . . . and all chattel paper covering the property

above described together with any such property returned to or repossessed by the Debtor." Financing statements covering such property were properly filed by GECC in 1976, and GECC acquired a perfected security interest in all of Northern Nevada's new and after-acquired inventory and proceeds. The security agreements further provided that Northern Nevada had the right to sell the inventory financed by GECC "in the normal course of its business," with repayment to be made to GECC on sale, or within 90 days.

HSA financed consumer purchases of mobile home units from Northern Nevada. In each case, where financing was approved, Home Savings would pay to Northern Nevada the total purchase price recited as remaining to be paid on a consumer installment sales contract and security agreement. In return, HSA acquired the rights of Northern Nevada under the contract and security agreement. HSA would then obtain title as secured party, through the Department of Motor Vehicles, or, later, the Manufactured Housing Division.

In early 1980, GECC learned that Northern Nevada had sold a substantial number of units "out of trust," *i.e.,* without payment of the proceeds to GECC. In fact, GECC estimated that as a result of such sales, Northern Nevada was then indebted to it for approximately $450,000.00. This debt was secured in part by the perfected security interest in all mobile home units that were part of Northern Nevada's inventory. As a result of Northern Nevada's default, GECC and Northern Nevada executed an agreement whereby Northern Nevada surrendered possession of its inventory, equipment, and other tangible personal property to GECC for liquidation to satisfy the debt.

On February 13, 1980, GECC asserted its security interest by repossessing the new and used mobile home units which it considered part of the inventory of Northern Nevada. When GECC asserted its security interest by repossessing the units, HSA objected to GECC's seizure of twenty-one mobile home units to which HSA asserted a prior interest. Nineteen of these units were located on a "storage lot" belonging to Northern Nevada and located at the corner of Yori and Wrondel streets in Reno. HSA had previously repossessed these units pursuant to its retail security agreements. HSA held either a Department of Vehicles Certificate of Title, describing it as legal owner, or a Certificate of Ownership issued by the state Manufactured Housing Division, describing HSA as lienholder. HSA and Northern Nevada had executed a Mobile Home Repossession Sales and Financing Agreement (Sales Agreement) pursuant to which HSA delivered repossessed units to Northern Nevada for resale. The Yori/Wrondel lot contained those used mobile home units which were

held for reconditioning and immediate or ultimate sale by Northern Nevada on behalf of various retail financers, including HSA.

One of the remaining two mobile homes, the so-called "Veach" unit, was located on a sales lot at the time GECC asserted a possessory interest in the inventory. The final unit, the "Del Rio" unit, was located off Northern Nevada's premises on a residential lot. The Del Rio unit was eventually sold by private sale.

GECC filed a declaratory relief action against HSA, and HSA responded with a counterclaim for conversion. Pursuant to court order the twenty units in Northern Nevada's possession were sold in a manner agreed upon by the parties, and the proceeds placed in an escrow account. At the conclusion of the nonjury trial, the district court rendered judgment in favor of GECC and ordered disbursement of the court-ordered sale proceeds to GECC. The district court held that GECC was entitled as well to the proceeds from the sale of the Del Rio unit. HSA moved to alter or amend judgment, or alternatively for a new trial.[1] The district court denied the motions. HSA appeals contending its claim to the proceeds has priority pursuant to its compliance with the title provisions of NRS Chapter 482 or Chapter 489 and its status as retail financer of consumers who are buyers in the ordinary course of business.

## UNITS ON YORI/WRONDEL LOT

The evidence indicates that the units on the storage lot at Yori and Wrondel were there as a result of repossessions by various retail financers including HSA. The trial court determined upon substantial evidence that the nineteen units in question were placed on the lot by direction of HSA's mobile home department manager, James Biglieri, for resale pursuant to the Sales Agreement between HSA and Northern Nevada. At trial GECC asserted, and the district court agreed, that these units were part of Northern Nevada's inventory and that GECC as inventory financer had a perfected security interest in after-acquired inventory. The district court held that GECC had priority over the interest of HSA in the same units under applicable provisions of the Uniform Commercial Code. The district court also held that the Sales Agreement was a consignment not intended as security, and, therefore, HSA was obliged to protect its interests against a competing secured creditor by taking the steps required of con-

---

[1]HSA appeals the trial court's dismissal of the motion for a new trial. HSA's contention is without merit. The granting or denying of a new trial is largely discretionary with the trial court, and that court's determination will not be reversed on appeal unless abuse of discretion is clearly shown. Quilici v. Battaglia, 78 Nev. 413, 374 P.2d 887 (1962).

signors under NRS 104.2326. Since HSA failed to do so, the district court held that GECC's security interest had priority.

On appeal, HSA contends that it should not be bound by the transaction through which Northern Nevada came into possession of the used units, since the repossessions were effected by representatives of Northern Nevada and HSA's employees as part of a scheme to defraud HSA. Ordinarily, the decision to replace the units on Northern Nevada's lot was within the authority and responsibility of HSA's manager of the mobile home department. There was evidence, however, that only four of these repossessions were internally reported by Biglieri to HSA management. HSA management was also unaware that Northern Nevada was paying on a substantial number of contracts on which consumers had defaulted. An assistant to Biglieri testified that she and Biglieri were involved in a scheme in which they collected secret payoffs from Northern Nevada for each consumer installment sales contract which HSA financed. HSA management began to unravel the scheme in late 1979. In early 1980 HSA's Vice President-Administrator in charge of its mobile home department, and its Vice President and Internal Auditor, visited the Yori/Wrondel lot to inspect the units. At this time, HSA did nothing to indicate that the consignment of the units was contrary to HSA and Northern Nevada's Sales Agreement.

Accepting the truth of appellant's assertions in this regard, we see no basis for holding that the rights of HSA vis-a-vis GECC should be affected by fraud perpetrated by HSA employees and Northern Nevada. There has never been a suggestion that GECC was other than an innocent third party, which had itself suffered from the fraudulent and unscrupulous conduct of the same dealer. Biglieri, as manager of the mobile home department for HSA, was acting within the scope of his inherent authority in authorizing transfer of the mobile home units to the Northern Nevada lot. HSA, as principal, may be bound by the acts of its agent as to third parties who have no reason to know of the agent's improper conduct. This is so even when the agent acts for his own motives and without benefit to his principal. *See* Nevada Nat'l Bank v. Gold Star Meat Co., 89 Nev. 427, 514 P.2d 651 (1973); Dougherty v. Wells Fargo & Co., 7 Nev. 368 (1872). *See also* Restatement (Second) Agency, § 8A; § 112, comment C, at 292, and § 165 (1958).

Alternatively, HSA contends it is a perfected secured creditor by virtue of its compliance with NRS Chapters 482 and 489, and thus has priority over GECC's interest. Further, HSA contends that the subsequent Sales Agreement does not alter this result due to the fact that the transaction was a consignment intended as

security, and HSA retains its original perfected status pursuant to NRS 482.432 and NRS 489.581.

In NRS Chapter 489, now applicable to mobile homes, as well as Chapter 482, which was applicable to the majority of the earlier purchases, the legislature has specified that compliance with applicable title provisions "is sufficient for the perfection and release" of a security interest in a mobile home "and for exemption from the requirement of filing a financing statement under the provisions of paragraph (b) of subsection 3 of NRS 104.9302." NRS 482.432 and NRS 489.581.[2] HSA, as retail financer, originally had, as to these units, a perfected security interest. But in "all other respects," however, "the rights and duties of the debtor and secured party are governed by the Uniform Commercial Code—Secured Transactions" to the extent applicable. *Id.* Thus, NRS 482.432 and NRS 489.581 do not provide the exclusive means to perfect a security interest in a mobile home unit. NRS 482.433, NRS 489.581 and NRS 104.9302(3)(b). When HSA consigned the nineteen units to Northern Nevada for resale, the transaction was subject to other applicable provisions of the Uniform Commercial Code.

HSA and Northern Nevada executed a Sales Agreement that covered nineteen of the units on the Yori/Wrondel lot. Under this Sales Agreement, HSA conveyed repossessed units to Northern Nevada on consignment for resale. Northern Nevada testified that the used units on the Yori/Wrondel lot were held there for immediate or ultimate resale. These units were then part of Northern Nevada's inventory. NRS 104.9109(4). Pursuant to NRS 104.2326, which governs consignment sales, the nineteen

---

[2]NRS 482.432 provides:

Compliance with the applicable provisions of NRS 482.423 to 482.431, inclusive, is sufficient for the perfection and release of a security interest in a vehicle and for exemption from the requirement of filing of a financing statement under the provisions of paragraph (b) of subsection 3 of NRS 104.9302. In all other respects the rights and duties of the debtor and secured party are governed by the Uniform Commercial Code—Secured Transactions and chapter 97 of NRS to the extent applicable.

NRS 489.581 provides:

Compliance with the provisions of this chapter relating to a security interest in a manufactured home, mobile home or commercial coach is sufficient for the perfection and release of that security interest and for exemption from the requirement of filing a financing statement under the provisions of paragraph (b) of subsection 3 of NRS 104.9302. In all other respects the rights and duties of the debtor and secured party are governed by the Uniform Commercial Code—Secured Transactions and chapter 97 of NRS to the extent applicable.

units are deemed to be on "sale or return" and, hence, "subject to the claims of the buyer's creditors" where NRS 104.2326(3) is not complied with, whether or not the consignment is intended for security.[3]

The purpose of NRS 104.2326(3) is to provide the methods by which HSA could protect its interest in the units against an inventory secured creditor of Northern Nevada. HSA failed to qualify for this protection under NRS 104.2326(3)(a) or (b). HSA contends that this Sales Agreement was a consignment intended as security. HSA further contends that the perfection of its interest pursuant to NRS Chapters 482 or 489, then satisfies the requirements of NRS 104.2326(3)(c). We disagree.

"Security interest" means an interest in personal property which secures payment or performance of an obligation. NRS 104.1201(37). Unless a consignment is intended as security, reservation of title is not a "security interest" but a consignment is in any event subject to the provisions on consignment sales (NRS 104.2326). Id. The district court found that the Sales Agreement did not evince an intent that the consignment was intended as security. We agree.

While the Sales Agreement provides that HSA will retain title

---

[3]NRS 104.2326 provides in relevant part:

1. Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:

\* \* \* \* \*

(b) A "sale or return" if the goods are delivered primarily for resale.

2. Except as provided in subsection 3, goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

3. Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." However, this subsection is not applicable if the person making delivery:

(a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

(b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

(c) Complies with the filing provisions of the article on secured transactions (article 9).

to the units until they are resold, there is no showing that the parties intended this consignment to be a security interest. Paragraph A of the Sales Agreement, entitled Intent, states:

> [t]he intent or objective of both parties concerned is to collectively work together on a continuing program to liquidate or resell repossessed mobile homes at the least amount of loss or cost to both lender and dealer. . . .

The clear intent of the Sales Agreement was the resale of repossessed units by Northern Nevada for HSA. There is no indication in the Sales Agreement that Northern Nevada was absolutely obligated to HSA for the price of the "consigned" goods at the time of consignment. Nor was there any indication that Northern Nevada could not return unsold goods to HSA at any time. Under the Sales Agreement, HSA was permitted access to Northern Nevada's lot to inspect the units. The record indicates that HSA exercised this right. Moreover, HSA set the release or purchase price to the dealer for each unit. HSA retained responsibility for all insurance costs for units while on Northern Nevada's lots, as well as relocation costs, park rents, lot rents, penalties and back taxes. Thus, there is no indication that the intent of the parties was to effect a consignment intended for security. *See* Winship, The "True" Consignment Under the Uniform Commercial Code, and Related Peccadilloes, 29 Southwestern Law Journal 825 (1975); Duesenberg, Consignments Under the UCC: A Commentary on Emerging Principles, 26 The Business Lawyer 565 (1970-71). There is substantial evidence supporting the district court's decision that the Sales Agreement was a consignment not intended as security. We will not disturb this finding on appeal. Udevco v. Wagner, 100 Nev. 185, 678 P.2d 679 (1984).

As discussed *supra,* the title provisions of either NRS 482.432 or NRS 489.581 are not the exclusive means to perfect a security interest. Since the consignment was not intended as security, in the case at bar HSA's compliance with NRS 104.2326 and NRS 104.9114 was the required method to protect its interest in the used units.[4] NRS 482.433, NRS 489.581 and NRS

---

[4]NRS 104.9114 provides:

> 1. A person who delivers goods under a consignment which is not a security interest and who would be required to file under this article by paragraph (c) of subsection 3 of NRS 104.2326 has priority over a secured party who is or becomes a creditor of the consignee and who would have a perfected security interest in the goods if they were the property of the consignee, and also has priority with respect to identifiable cash proceeds received on or before delivery of the goods to a buyer, if:

104.9302(3)(b). HSA failed to comply with NRS 104.9114 and, hence, failed to satisfy the protective provisions of NRS 104.2326(3). The nineteen units on Northern Nevada's Yori/Wrondel lot were subject to GECC's claims as an inventory secured creditor.

The district court correctly held that GECC's security interest had priority over HSA's interest.

### THE DEL RIO UNIT

The so-called Del Rio Unit was purportedly sold to Barbara Del Rio pursuant to an installment sales contract for which HSA paid Northern Nevada the recited amount of the remaining purchase price. At the time of the seizure of Northern Nevada's inventory by GECC, the unit was on a residential site. The district court held that Barbara Del Rio never purchased the unit, and hence HSA's interest was void. On appeal, HSA contends Del Rio's status as a "buyer in the ordinary course of business" cuts off GECC's security interest. NRS 104.9307(1).

The evidence indicates that Barbara Del Rio never made the down payment to Northern Nevada. Northern Nevada's president testified that Del Rio "paid some monies," but did not complete the down payment, and the "deal fell through." He also testified that payments to HSA on the contract were made by Northern Nevada. Del Rio did not take possession of the unit. The unit was never delivered to Del Rio. Nor did she make any installment payments to HSA. There was testimony by Biglieri's assistant and an HSA officer regarding the irregularities in the application. There was no transfer of title to HSA. Subsequent to this transaction, there was a second installment sales contract signed by Donald and Virginia Leverett for the same unit. Eventually,

---

(a) The consignor complies with the filing provision of the article on sales with respect to consignments (paragraph (c) of subsection 3 of NRS 104.2326) before the consignee receives possession of the goods; and

(b) The consignor gives notification in writing to the holder of the security interest if the holder has filed a financing statement covering the same type of goods before the date of the filing made by the consignor; and

(c) The holder of the security interest receives the notification within 5 years before the consignee receives possession of the goods; and

(d) The notification states that the consignor expects to deliver goods on consignment to the consignee, describing the goods by item or type.

2. In the case of a consignment which is not a security interest and in which the requirements of the preceding subsection have not been met, a person who delivers goods to another is subordinate to a person who would have a perfected security interest in the goods if they were the property of the debtor.

GECC itself financed this sale to the Leveretts. A Certificate of Ownership was issued listing the Leveretts as owners and GECC as lienholder. The Leveretts later rescinded the contract, and the unit was repossessed by GECC and resold. There was substantial evidence upon which the trial court could have concluded that the Del Rio transaction was a "sham sale." Where a district court has made a determination on the basis of conflicting evidence, we will not disturb that determination if it is supported by substantial evidence. Kulick v. Albers Incorporated, 91 Nev. 134, 532 P.2d 603 (1975).

In such circumstances, where it appears that there has not been a "buyer" at all, neither NRS 104.9306(2), which requires a "buyer" for a "sale," nor NRS 104.9307(1), which requires a "buyer in the ordinary course," come into play. *See* First Nat. Bank, Etc. v. Ford Motor Credit, 646 P.2d 1057 (Kan. 1982). Thus, HSA cannot prevail, and the district court correctly ruled that GECC was entitled to the proceeds with regard to this unit.

## THE VEACH UNIT

The Veach unit was located on one of Northern Nevada's sales lots, rather than the storage lot, when GECC seized the inventory of Northern Nevada. The district court found that the Veach transaction did not constitute a sale or disposition authorized by GECC in the security agreement. The district court held that pursuant to NRS 104.9306(2) GECC's interest in the Veach unit had not been terminated, and HSA's interest was not entitled to priority.[5] We disagree.

Jack and Trudy Veach executed an installment sales contract and security agreement with Northern Nevada for the purchase of a 1978 Governor mobile home unit. The unit was financed through HSA which had purchased the chattel papers from Northern Nevada for $15,631.50. A Certificate of Title issued October 3, 1979 and listed the Veaches as owners and HSA as lienholder. The Veach unit was still on Northern Nevada's sales lot when GECC repossessed Northern Nevada's inventory. The Veach unit was eventually sold with the other units seized by GECC but claimed by HSA. The proceeds were placed in escrow.

At trial there was conflicting evidence over the amount of the

---

[5]NRS 104.9306(2) provides:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

down payment the Veaches actually made. Northern Nevada employees testified that because the full down payment had not been made, they never delivered the unit. Trudy Veach testified that they did not take actual delivery of the unit because they did not yet have a residential lot on which to install it. Trudy Veach testified that the unit was still on Northern Nevada's lot for the Veaches' convenience and that Northern Nevada informed them that the unit could remain on the lot until the Veaches were able to find a location on which to install it. The Veaches signed a separate delivery receipt indicating that the unit had been delivered and set up to their satisfaction, when in fact it had not. The Veaches made timely monthly payments to HSA on their installment agreement beginning in October, 1979 and continuing for the next six months. The Veaches stopped making payments when they went to Northern Nevada's lot to "see our trailer" and it had GECC's receivership sign in its window. Whatever unresolved details regarding the down payment may have existed between the Veaches and Northern Nevada, the record reveals that the Veaches intended to purchase and believed that they had purchased and owned the unit and were in the process of fulfilling the terms of the sales contract. The Veaches acted in good faith and were unaware that any portion of this transaction may have been in violation of Northern Nevada's security agreement with GECC. NRS 104.1201(9); NRS 104.1201(19); *See generally* Martin Marietta Corp. v. N.J. Nat. Bank, 612 F.2d 745 (3rd Cir. 1979). When the Veaches became aware that the unit was in receivership to GECC however, they stopped their payments to HSA, advised HSA that they were defaulting on their sales contract and permitted HSA to repossess the unit in satisfaction of the debt.

 ██ ██

Where an inventory financer, such as GECC, authorizes sale by a dealer out of inventory of a mobile home unit in which the financer has a security interest, or alternatively where a sale is made to a buyer in the ordinary course of business, the vehicle is taken free and clear of the inventory financer's security interest. NRS 104.9306(2); NRS 104.9307(1); NRS 104.9308(2). *See* Bank of Beulah v. Chase, 231 N.W.2d 738 (N.D. 1975). A purchaser of chattel paper, such as HSA, who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in chattel paper which is claimed merely as proceeds of inventory. NRS 104.9308. The interest of the retail financer then has priority over the security interest of the inventory financer. *See* Bank of Beulah v. Chase, *supra,* Rex Financial Corp. v. Great Western Bank & Trust, 532 P.2d 558 (Ariz.App. 1975); Chrysler Credit Corp. v. Sharp, 288 N.Y.S.2d 525 (N.Y.Sup. 1968).

NRS 104.2103(a) provides that a "buyer" is a person who buys or contracts to buy goods. According to NRS 104.2106(1), "[a] 'sale' consists in the passing of title from the seller to the buyer for a price (NRS 104.2401)." The Code then explicitly provides, pursuant to NRS 104.2401(3), that "[u]nless otherwise explicitly agreed where delivery is to be made without moving the goods: (a) If the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents." Thus an agreement to purchase, deferring delivery until certain contract terms are met, does not negate the conclusion that there has been a "sale" nor does it deprive the buyer the status of "buyer in the ordinary course." *See* Serra v. Ford Motor Credit Co. et al., 463 A.2d 142 (R.I. 1983); Chrysler Credit Corp. v. Sharp, *supra. See also* Intern. Harvester Credit v. Associates Fin. Serv., 211 S.E.2d 430 (Ga.App. 1974).

With regard to the interest of GECC, NRS 104.9306(2) provides that, unless the article otherwise provides, "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized* by the secured party in the security agreement or otherwise. . . ." (Emphasis added.) Thus, if the sale was authorized, "the lender's interest is severed at the moment of sale, and the buyer acquires full rights in the collateral. In addition, any secured party claiming through the buyer takes free of the original security interest." Bazelon, *The Priority Rules of Article Nine,* 62 Cornell L. Rev. 834, 941 (1976-77). *See* Crystal State Bank v. Columbia Heights State Bank, 203 N.W.2d 389 (Minn. 1973).

In this case, the security agreement between Northern Nevada and GECC explicitly authorized the debtor to sell all inventory financed by GECC "in the normal course of its business." The Veach transaction was a sale of a unit from its inventory to a retail consumer. Northern Nevada was undisputably a seller of mobile home units. In selling mobile home units to consumers, such as the Veaches, Northern Nevada was precisely engaged in the "normal course of its business." *See* White and Summers, Uniform Commercial Code, § 25-12, 1980 Ed. The trial court's holding that the sale was unauthorized was clearly erroneous. Avery v. Gilliam, 97 Nev. 181, 182, 625 P.2d 1166, 1168 (1981); London Overseas, Ltd. v. Harris, 92 Nev. 62, 64, 544 P.2d 1202, 1203 (1976).

Thus, the sale of the mobile home unit to the Veaches terminated the interest of GECC in the mobile home itself. We are not persuaded that the existence of any irregularities on the part of the dealer or the consumer in their dealings with HSA should alter this result. *Cf.* Serra v. Ford Motor Co. et al., *supra;*

608

Chrysler Credit Corp. v. Sharp, *supra*. *See* R. Skilton, *Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code*, 1974 Wis.L.Rev. 1, 76-88.

Upon the sale of the mobile home to the Veaches, GECC's security interest shifted from the unit itself to the proceeds of such sale. As the retail financer, HSA's claim to the Veach unit had priority over any claims that GECC might assert. NRS 104.9306; NRS 104.9308. This conclusion is dispositive of the issue of HSA's priority, and we need not decide whether the district court erroneously held that the Veaches were not buyers in the ordinary course of business. Finance America Com. Corp. v. Econo Coach, 454 N.E.2d 1127 (Ill.App. 2 Dist. 1983); In re Frank Meador Leasing, Inc., 6 B.R. 910 (Va. 1980). Accordingly, appellant, with the sole security interest in the unit, was entitled to its possession on the Veaches' default. Therefore, appellant is entitled to the proceeds of its subsequent sale. The district court erred in awarding the proceeds of the sale of the Veach unit to GECC.

### CONCLUSION

We reverse that part of the judgment below that awards the proceeds of the Veach unit to GECC and remand for entry of judgment consistent herewith. The judgment of the district court is affirmed in all other respects.