**AETNA FINANCE COMPANY d/b/a Thorp Credit, Inc. of Indiana, Appellant (Plaintiff Below),**

v.

**Kevin E. HENDRICKSON, John Melvin Ream, and Sperry New Holland, a Division of Sperry Corporation, Appellees (Defendants Below).**

**No. 55A04–8708–CV–254.**

Court of Appeals of Indiana,
Third District.

Aug. 18, 1988.

Lawrence M. Reuben, Atlas & Reuben, P.A., Indianapolis, for appellant.

R.C. Richmond, III, Ancel, Miroff & Frank, P.C., Indianapolis, for appellee Sperry New Holland.

HOFFMAN, Judge.

Aetna Finance Company, d/b/a Thorp Credit, Inc. of Indiana (Thorp) is appealing a negative judgment rendered in favor of Sperry New Holland, a division of the Sperry Corporation (Sperry). The trial court reached its decision after a trial without a jury and the court determined that Sperry's security interest in certain equipment had priority over Thorp's security interest in the same equipment. Although the case was decided on stipulated facts, a fairly complete factual recitation is necessary to understand the issues presented.

This appeal stems from the activities of John Ream, who was the principle owner of Martinsville Equipment Company, Inc. (MEC). MEC was a farm machinery dealership located in Morgan County, Indiana. In 1977 MEC became a dealer of Sperry farm machinery, as evidenced by a document titled, "Dealer Security Agreement." This agreement essentially created a standard floor planning arrangement whereby Sperry financed MEC's inventory of Sperry-manufactured equipment and retained a security interest in each item and in any proceeds. MEC, in turn, was obligated to remit the proceeds to Sperry after each sale. The agreement also gave Sperry the right to inspect MEC's premises, inventory, and financial records.

In September 1979, MEC was having financial difficulties. John Ream induced an employee, Kevin Hendrickson, to sign a sales contract for a Sperry combine and other farm equipment with a total contract price of more than $45,000.00. Hendrickson agreed to sign, although he was not a farmer, because John Ream told him that he, Ream, would make all the payments, and that the deal would be a good way to establish a credit rating. The sales contract granted MEC a security interest in the equipment, and immediately after signing, MEC assigned its security interest to Thorp for a cash payment of $45,000.00. Thorp, in turn, took all applicable steps to perfect its interest. Despite the sales contract, it is undisputed that Hendrickson never took possession of the equipment, and the equipment was never removed from MEC's unsold inventory list. Moreover, in violation of the Dealer Security Agreement, MEC did not send the money received from Thorp to Sperry, instead the money was retained and used as working capital.

Thereafter, in November 1979, MEC sold part of the equipment involved in the Hendrickson contract to a David Ream, who was John Ream's son. The record indicates that the son was unaware of his father's machinations, and took possession of, and legitimately used, the equipment on his own farm. The sale to the son also involved a sales contract which, this time, MEC assigned to Sperry as payment for pre-existing debt. The son made payments in accord with the terms of his sales contract until he defaulted in February 1981. At this time Sperry repossessed and resold the equipment. It is undisputed that Sperry acted without knowledge of Thorp's involvement.

Also, in April 1980, before repossessing the son's equipment, Sperry terminated its dealership relationship with MEC. Incident to this action Sperry repossessed and

resold MEC's inventory including some equipment involved in the Hendrickson contract.

Additionally, Thorp received Hendrickson's 1980, 1981, and 1982 contract payments. In reality, the money Hendrickson used for the more than $12,000.00 annual payments came directly from John Ream, but when the final, 1983 payment came due Ream was unable to provide the funds and consequently Hendrickson defaulted. The default caused Thorp to attempt to repossess the equipment which Sperry had previously resold. Ultimately, the scheme unraveled and Thorp filed the present action in June 1983.

The trial court, in written findings, awarded Thorp a judgment against Hendrickson and Ream jointly for the unpaid loan balance, and the court assessed punitive damages solely against John Ream. As previously indicated, the court found that as between Thorp and Sperry, Sperry had the superior claim to the equipment and to the proceeds of the resale. It is only this adverse finding that Thorp is appealing and on appeal the following issues are presented:

  (1) whether the trial court correctly applied § 9–308 of Indiana's Uniform Commercial Code;

  (2) whether the trial court correctly found the fraudulent sale between MEC and Hendrickson to be the controlling issue;

  (3) whether the second sale, to the son, affected Thorp's rights; and

  (4) whether Thorp failed to prove a case for common-law replevin.

Resolution of this case rests on the application and applicability of IND. CODE § 26–1–9–308 (1982 Ed.).[1] Research reveals no Indiana appellate level cases applying this section of the Secured Transactions Chapter of Indiana's Uniform Commercial Code. Nonetheless issues strikingly similar to those of the case at bar have been addressed by courts in other jurisdic-

tions, and while not controlling here, these cases do provide persuasive authority.

As effective for the time period relevant here, U.C.C. § 9–308[2] reads:

"A purchaser of chattel paper or a nonnegotiable instrument who gives new value and takes possession of it in the ordinary course of his business and without knowledge that the specific paper or instrument is subject to a security interest has priority over a security interest which is perfected under section 9–304 (permissive filing and temporary perfection). A purchaser of chattel paper who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in chattel paper which is claimed merely as proceeds of inventory subject to a security interest (section 9–306), even though he knows that the specific paper is subject to the security interest."

The focus in this case must narrow to the second part of this section, since Sperry's security interest arises solely from its position as inventory financer and its consequential claim to proceeds.

This second section, which establishes the priorities between the retail financer and the inventory financer, is unusual because it plainly grants priority to a party, the retail financer, whose interest arose last, and who acted with knowledge of the prior security interest. Clearly then, from a policy perspective, this section places the retail financer in a favored position. In this case, Thorp acted as a retail financer, and in order for it to claim the protection of U.C.C. § 9–308 Thorp must show that it was 1) a purchaser; 2) of chattel paper; 3) which gave new value; and that 4) it took possession of the chattel paper; 5) in the ordinary course of its business.

On review of the facts, it appears that there is virtually no question that Thorp fulfilled most of the requirements of § 9–308. It is undisputed that Thorp was in the business of buying sales contracts,

1. Hereafter all references to the Uniform Commercial Code will be made by citing only the U.C.C. Chapter and Section numbers.

2. Although U.C.C. § 9–308 has since been amended, the changes do not affect the result reached here.

and it clearly gave new value and took possession of the contract after it made the purchase. The only remaining question regarding Thorp's eligibility for U.C.C. § 9–308 protection is whether the sales contract was, in fact, chattel paper. "Chattel paper" is defined at U.C.C. § 9–105(1)(b) and the term means, "a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods."

From this definition, it is obvious that Thorp at least intended to purchase chattel paper. Since the Hendrickson contract unquestionably evidences a monetary obligation, the question to be decided here becomes, whether the Hendrickson contract also evidences a valid security interest.

"Security interest" is defined at U.C.C. § 1–201(37) to mean "an interest in personal property or fixtures which secures payment or performance of an obligation." Under U.C.C. § 9–204 (now U.C.C. § 9–203) a security interest is not valid until the interest attaches and the prerequisites to attachment are there must be an agreement, value must be given, and the debtor must acquire rights in the collateral. Here, the sales contract represents Hendrickson's agreement to become indebted, and the $45,000.00 payment clearly represents value given. Accordingly the central issue again reduces to whether Hendrickson acquired sufficient rights in the property for Thorp's security interest to attach.

This question is actually the core question underlying this appeal. Sperry contends, and the trial court held, that the fraudulent nature of the transaction between Hendrickson and MEC invalidated the sale and resulted in Hendrickson acquiring no rights in the collateral. Conversely, Thorp argues that, regardless of any underlying fraud, the security interest attached, and the elements of § 9–308 were fulfilled; thus establishing its priority.

There are no Indiana cases discussing what degree of rights a debtor must have in the collateral before a security interest can attach; however, cases from other jurisdictions are illustrative. Initially, it is

useful to recognize that requiring the debtor to have rights in the collateral is simply an application of the general principle that one cannot encumber another's property without consent. *Matter of Pubs, Inc. of Champaign* (7th Cir.1980) 618 F.2d 432. However, it is clear that the debtor need not have title to the goods, *State Bank of Young America v. Vidmar Iron Works, Inc.* (1980), Minn., 292 N.W.2d 244, and that possession of the collateral is also not the guiding principle. *Manger v. Davis* (1980), Utah, 619 P.2d 687.

A growing number of cases hold that the debtor's signing of a sales contract for the purchase of goods, by itself, represents sufficient rights to permit attachment of a security interest in the goods.

See e.g. *Borg Warner Acceptance Corp. v. C.I.T. Corp.* (1984), Tex.App., 679 S.W.2d 140;

*Kendrick v. Headwaters Production Credit Association* (1987), 362 Pa.Super. 1, 523 A.2d 395.

While the logic of these cases is well grounded in the policies supporting the Uniform Commercial Code, in the present case, it is unnecessary to hold that a sales contract alone creates sufficient rights for U.C.C. § 9–204 to operate, because here there is significantly more evidence.

Not only did Hendrickson sign a sales contract but there is also a record of three years and over $36,000.00 in payments on the sales contract. Extensive payments on a sales contract is unquestionably stronger evidence that a debtor has rights in the collateral than simply a sales contract alone. It is immaterial that the money for Hendrickson's installment payments came from a third party, because as between the creditor, Thorp, and the debtor, Hendrickson, the source of the payments is irrelevant to the sales contract. Thus, in this case, the sales agreement, coupled with the substantial contract payments is ample evidence that Hendrickson had sufficient rights in the farm machinery for Thorp's security interest to attach.

Since Hendrickson had rights in the collateral and since it is undisputed that Hendrickson agreed to the sales contract and

that Thorp gave value, it follows that Thorp's security interest attached and, accordingly, Thorp's security interest is valid under U.C.C. § 9–204. Since Thorp's security interest is valid and since the contract also evidences a monetary obligation, then the Hendrickson contract is chattel paper as defined by U.C.C. § 9–105(b). Since Thorp purchased chattel paper, it must be concluded that Thorp fulfilled the requirements of U.C.C. § 9–308 by purchasing chattel paper for new value and taking possession of the chattel paper in the ordinary course of its business. The conclusion that Thorp satisfied the elements of U.C.C. § 9–308 leads inexhorably to the conclusion that the trial court erred and that Thorp's security interest is superior to Sperry's interest.

■ The trial court, in reaching its decision, recognized the foregoing facts and acknowledged U.C.C. § 9–308. Nonetheless, the court held that the fraud involved in the transaction essentially suspended the operation of U.C.C. § 9–308. The court found primary support for this conclusion in U.C.C. § 1–103, which provides:

"Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

This statute led the court out of the Uniform Commercial Code and to the Statute of Frauds. Specifically, the court relied on IND.CODE § 32–2–1–7 which reads:

"Every sale made by a vendor, of goods in his possession or under his control, unless the same be accompanied by immediate delivery, and be followed by an actual change of the possession of the things sold, shall be presumed to be fraudulent and void, as against the creditors of the vendor, or subsequent purchasers in good faith, unless it shall be made to appear that the same was made

in good faith and without any intent to defraud such creditors or purchasers."

From this statute, the trial court concluded that because the farm machinery was never delivered, the sale to Hendrickson was void and Hendrickson had no interest to convey to Thorp.

■ While IND.CODE § 32–2–1–7 and the rest of the Statute of Frauds, is generally still vital law, the statute cannot be applied in the manner used by the trial court. As the first part of U.C.C. § 1–103 implies, alternative sources of law are intended to supplement and not to supplant the Uniform Commercial Code. This Statute of Frauds provision must be applied in the context of the entire code, and specifically in the context of U.C.C. § 9–102 (1986 Supp.) which reads:

"(1) Except as otherwise provided in IC 26–1–9–104 on excluded transactions, IC 26–1–9 applies:

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts; and also

(b) to any sale of accounts or chattel paper."

This section makes clear that Article 9 of the U.C.C. is intended to exclusively govern all manner of secured transactions, including the sale of chattel paper. Additionally, the analysis developed above, which demonstrates that Hendrickson acquired sufficient rights in the farm machinery for a security interest to attach, directly conflicts with the Statute of Frauds provision cited by the trial court, which leads to the conclusion that Hendrickson acquired no rights at all. Unquestionably, in cases of conflict, the Uniform Commercial Code takes precedence.

The conclusion that IND. CODE § 32–2–1–7 is inapplicable is impliedly supported by *United Leaseshares, Inc. v. Citizens Bank & Trust* (1984), Ind.App., 470 N.E.2d 1383, which is the sole case applying this part of the Statute of Frauds in the context of secured transactions. In *United*

*Leaseshares* this Court held that IND. CODE § 32–2–1–7 voided the sale portion of a sale-leaseback transaction. However, before the court applied the Statute of Frauds, the court first held that the appellants' failure to perfect their security interest denied them Article 9 protection and thus no conflict could have arisen between the Statute of Frauds and Article 9.

The foregoing analysis, concluding that the fraudulent nature of Hendrickson's transaction with MEC does not affect Thorp's rights under U.C.C. § 9–308, is also supported by several cases from other jurisdictions. *Borg Warner Acceptance Corp. v. C.I.T. Corp.* (1984), Tex.App., 679 S.W.2d 140, involved facts that are functionally equivalent to the present case. In *Borg Warner*, the Texas court affirmed a judgment for the retail financer, C.I.T. Corp. The appellate court found that, although C.I.T.'s chattel paper was the product of a sham sale, the debtor acquired sufficient rights in the collateral for C.I.T.'s security interest to attach under § 9–203. Additionally, the Texas court also held that C.I.T.'s retail financer's security interest was superior to Borg Warner's inventory financer's interest. *Id.*

Another case that involves extremely similar facts is *American State Bank v. Avco Financial Services* (1977), 71 Cal. App.3d 774, 139 Cal.Rptr. 658. While this case is not citeable authority, *see* 141 Cal. Rptr. 447, 570 P.2d 463, it still contains persuasive analysis and a valuable presentation of the underlying policies.

The California case again resolved a priority conflict between an inventory financer and a retail financer holding chattel paper produced by a sham sale. The California appeals court applied U.C.C. § 9–308 and decided that the retail financer held the superior security interest. In reaching its decision the court reasoned:

"In other words, the effective functioning of the mercantile community in this area requires that those institutions financing retail purchases by means of the purchase of chattel paper be entitled to rely on the represented validity of that paper unless they have such knowledge as to preclude their being bona fide purchasers. The same reasons for placing the risk on the flooring lender, if the dealer absconds with the funds received from the bank that it was bound to pay to the flooring lender, should apply to the set of facts before us where the sales were dummied up from the start. Parenthetically, in the reasoning which underlies it, this result parallels the well-established rule in the negotiable instruments field that a drawee who has paid a bill of exchange or check on which the drawer's or maker's signature has been forged cannot recover the payment from a holder in good faith for value and without fault. (*United States v. Chase Nat. Bank,* 252 US 485, 494, [40 S.Ct. 361, 362, 64 L.Ed. 675].) Beyond that, it may be too elementary to observe, but, once this step has been taken to recognize that chattel paper, although irregular in its inception, can become valid and enforceable in the hands of a bona fide purchaser (just as can a forged bill of exchange), it necessarily follows that the right to possession of the tangible property subject to the chattel paper is dictated by the terms thereof.

In summary then, once a dealer has launched even irregular chattel paper in the mercantile stream and into the hands of a bona fide purchaser, chattel paper which covers tangible property which once was collateral of the dealer's financing party, the chattel paper becomes the collateral and the rights in that chattel paper control and represent the power to dispose of the tangible property upon default of the obligation stated in the chattel paper. This is the expectation under which the mercantile community operates, and the law should reflect it."

One additional case supporting the retail financer's priority should be noted. *Aetna Finance Corp. v. Massey Ferguson, Inc.* (S.D.Ind.1985), 626 F.Supp. 482 also stemmed from the activities of John Ream and his Martinsville Equipment Company. The primary factual difference between the present case and the federal court case is that, in the earlier case, the court did not specifically find that the underlying sale

was fraudulent, despite the fact that the equipment was never delivered. Nonetheless, Massey Ferguson's primary argument for the superiority of its inventory financer's security interest was that the equipment purchaser did not acquire any interest in the equipment.

Judge Steckler analyzed the situation and found the issue of actual delivery to be irrelevant. Instead the court applied U.C.C. § 9–308 and held Thorp's retail financer's interest to be superior. Thus, it is clear that the operation of U.C.C. § 9–308 is the same, regardless of fraud in the underlying transaction and that the present case is in harmony with this federal court case and the many cases like it.

> See e.g. Borg Warner Acceptance Corp. v. Massey Ferguson, Inc. (1986), Tex. App., 713 S.W.2d 351;
>
> International Harvester Credit Corp. v. Associates Financial Services Co., Inc. (1974), 133 Ga.App. 488, 211 S.E. 2d 430;
>
> Chrysler Credit Corp. v. Sharp (1968), 56 Misc.2d 261 288 N.Y.S.2d 525.

Finally, two cases on which Sperry and the trial court relied need to be briefly discussed. The first, Home Savings Association v. General Electric Credit Corp. (1985), 101 Nev. 595, 708 P.2d 280 again presents essentially the same retail financer-inventory financer conflict. In this case, however, the Nevada Supreme Court reached a directly contrary result and held the inventory financer's security interest to be superior. The Nevada court did not engage in any extensive reasoning to reach its decision, and, on the surface, it appears that this is simply an aberrant case. The one factual distinction in Home Savings which, in part, may explain the result, is that in that case the retail financer's employees apparently colluded with the dealer to produce the sham sales. 708 P.2d at 283. This fact calls into question the retail financer's good faith and could mandate a different result. See U.C.C. § 1–203.

The second case relied on by Sperry is Chartered Bank of London v. Chrysler Corp. (1981), 115 Cal.App.3d 755, 171 Cal. Rptr. 748 in which the California Court of Appeals found for the inventory financer on facts that are superficially similar to the present case. However, in this California case, the collateral was covered by a field warehousing arrangement with specific instructions before release. This factual situation removes the case from the normal operation of § 9–308.

Consequently, regarding the first two issues presented by this appeal, as dictated by the Uniform Commercial Code and the pertinent case law, it must be held that the trial court incorrectly applied U.C.C. § 9–308, and that it incorrectly found fraud to be the controlling issue. The focus now necessarily shifts to the issues Sperry raises in defense of its judgment.

Sperry initially argues that even if Thorp's security interest had priority, the second sale, to John Ream's son, cut off Thorp's interest. This argument is merely an extension of the previous discussion, because Sperry contends that, since the sale to Hendrickson was a sham, its security interest was not affected. On the contrary the foregoing discussion has repeatedly demonstrated that the focus of this case is not on the fraudulent nature of the transaction that produced Thorp's chattel paper. U.C.C. § 9–308 functions to legitimize a retail financer's security interest, embodied in chattel paper, regardless of irregularities in the underlying transaction. The initial transaction with Hendrickson did, in fact, terminate Sperry's interest in the collateral, and thus, the second transaction, with the son, did not alter Thorp's interest at all.

Sperry's next, and final issue, regards the nature of Thorp's complaint. Sperry attempts to characterize Thorp's complaint as one for replevin. From this Sperry contends that Thorp's claim is governed by the common-law rules and that Thorp has failed to prove the elements of a replevin action. On the contrary, this action, as with all other actions arising out of the Uniform Commercial Code is primarily governed by the remedies the Code provides, and, as a supplement, reference can be made to the common-law remedies. U.C.C.

§ 9–305 provides that upon default the secured party has a right to possession of the collateral, and if the collateral has previously been sold or otherwise disposed of, then U.C.C. § 9–306 grants the secured party a continuing security interest in the proceeds. Thus, in the present case, and without reference to the common-law rules, Thorp has a right to possess the farm equipment or to recover the proceeds from Sperry's resale.

Since Thorp has established its eligibility for the protection of U.C.C. § 9–308 and since Sperry has failed to divert the operation of the Code, this case is reversed.

Reversed.

CONOVER, P.J., and ROBERTSON, J., concur.